# EXHIBIT 5

1          UNITED STATES DISTRICT COURT

2      FOR THE CENTRAL DISTRICT OF CALIFORNIA

3                    - - -

4   FERREOL CARDENAS, SR., Individually,)
    and as the Personal Representative  )
5   for FERREOL CARDENAS, JR., Deceased )
    and ROSA CARDENAS,                  )
6                                       ) No. 2-15-cv-01469 PJW
              Plaintiffs,               )
7                                       )
         vs.                            )
8                                       )
                                        )
9   CITY OF MANHATTAN BEACH, MANHATTAN  )
    BEACH POLICE OFFICER MICHAEL LYNCH  )
10  (Serial No. 313), MANHATTAN BEACH   )
    POLICE OFFICER B. MUZATKO (Serial   )
11  No. 342) and Does 1 through 10,     )
    inclusive,                          )
12                                      )
                                        )
13            Defendants.               )
    _____    )

14

15                DEPOSITION OF

16           J. DANIEL AUGUSTINE, M.D.

17            LOS ANGELES, CALIFORNIA

18              APRIL 27, 2016

19

20

21   Atkinson-Baker, Inc.
     Court Reporters
22   (800)288-3376
     www.depo.com
23

24   REPORTED BY:  NATALIE BALLESTERO, CSR NO. 10149

25   FILE NO:    AA04A47

```
 1              J. DANIEL AUGUSTINE, M.D.,

 2              having first been duly sworn, was

 3              examined and testified as follows:

 4

 5                      EXAMINATION

 6    BY MR. WILLIAMSON:

 7         Q.    Can you please state you full name and spell

 8    your last name for the record please.

 9         A.    Yes.  It's Job Daniel Augustine.  Last name

10    is A-U-G-U-S-T-I-N-E.

11         Q.    Good afternoon, Dr. Augustine.  I introduced

12    myself off the record.  My name is Peter Williamson.  I

13    represent the Cardenas family in their action against the

14    City of Manhattan Beach.

15              Thank you, Doctor, for taking the time to do

16    this with us today.

17              We had a discussion off the record

18    concerning some time constraints that you have today.

19    You indicated to us that you could go to perhaps 3:00,

20    3:15 at the latest in this deposition.  And what counsel

21    and I have agreed is that in the event we are not able to

22    finish today, Mr. Sain is not able to finish his

23    questioning -- I think I'll probably finish mine, but in

24    the event he's not able to finish his, we'll reconvene to

25    a second date, and we'll complete this deposition another
```

1      Q.     And the next thing you mention in your

2    description of traumatic injuries is that there's a focal

3    bilateral deep fascial hemorrhage of the overlying

4    splenius capitis muscle.

5           What does that refer to?

6      A.     Those are the muscles that will attach to

7    the back of the skull, the splenius capitis, and that's

8    the fascia of the outer lining that encapsulates the

9    muscle which demonstrates a hemorrhage within that.

10     Q.     I'm going to mark just again for purposes of

11   illustration.  This will be No. 4, I believe.

12           (Whereupon Plaintiff's Exhibit 4

13            was marked for identification.)

14   BY MR. WILLIAMSON:

15     Q.     And does this illustration -- wonderful

16   Netter illustration which I love -- does he show the

17   muscles that you're referring to?

18     A.     He sure does.

19     Q.     Where would they be?  Are they identified on

20   this diagram?

21     A.     Yes.

22     Q.     So these are the muscles that basically --

23   are they the muscles that support your head or -- Well,

24   let me let you explain it.  What are the purposes of

25   these muscles?

1    A.    They're some of the muscles.  They offer

2  vagus movements.  The exact, I don't recall right now,

3  but they definitely help maintain, among other muscle

4  groups, the integrity of -- the postural integrity of the

5  head.

6    Q.    Now, it may be obvious, but just for the

7  record, what is a hemorrhage?

8    A.    A hemorrhage is a bleeding.

9    Q.    So not only do you have a skull fracture,

10  but there is some kind of bleeding in the area of these

11  muscles that we just referred to.

12         What would cause the bleeding apart from the

13  skull fracture?  Do you have an opinion about that?

14    A.    What would or what could?

15    Q.    What could?

16    A.    Well, any time there's a hemorrhage, that's

17  a sign of trauma of some sort.  In this case it may very

18  well be related to the fracture with blood tracking down

19  along the fascia.

20         Another possibility is another some sort of

21  trauma that was inflicted on that area, I would presume,

22  that caused that hemorrhage.

23    Q.    That's exactly what I was getting to.  Could

24  there have been some independent trauma to the neck

25  independent of the skull?  In other words, the skull

1    striking something or some blow to the head could be one

2    trauma, but there could have been an independent trauma

3    to the upper neck; is that right?

4         A.    It's possible.

5         Q.    There was another skull fracture in addition

6    to the 2-inch long midline that we just described

7    earlier; correct?

8         A.    Correct.

9         Q.    And this was non-displaced as well.  I think

10   you identified it as a 1 1/4 inch linear fracture; is

11   that right?

12        A.    Yes.

13        Q.    Now, you say it's identified coursing from

14   the right lateral aspect of the foramen magnum to the

15   right temporal bone petrosal ridge.

16             Describe to us what that all means.

17        A.    Yes.  Sure.

18             So again this fracture was identified

19   following the removal of the brain.  So it would be down

20   into the base of the skull where the foramen magnum --

21   where the spinal cord travels out of, and we see the

22   midline fracture that we described previously, and to the

23   right of that again spanning from the foramen magnum and

24   extending out towards the right side of the base of the

25   skull into a region which is a different bone, the

BY MR. WILLIAMSON:

Q.    Okay.  You'd defer to a toxicologist with respect to that question?

A.    That, yes.

Q.    Okay.  Now, I want to go to Page 6 of your autopsy report under your opinions section.

      And you indicate that the cause of death is attributed to blunt head trauma.

      Were you able to determine, as I referenced earlier, what the manner of that blunt head trauma was?

A.    Oh, yes.

Q.    Okay.  What do you believe the manner of that was?

A.    Homicide.

Q.    Death meaning death at the hands of another?

A.    Correct.

Q.    Okay.  You came to that conclusion based on what?

A.    Based on circumstances and history of an altercation with law enforcement, with the deployment of the Conducted Energy Device, and a subsequent fall which is correlated to my autopsy findings of linear skull fractures, further supported by Dr. Lwin's neuropathological findings.

Q.    Okay.  Let me ask you, first of all, did you

1    consider any other possibilities for the blunt force

2    trauma other than a fall, for example?

3         A.    I have no other history to suggest that it

4    was.

5         Q.    Okay.  But in this case the history was

6    that, according to the officer who was standing 3 feet

7    away from the individual, that he didn't observe him hit

8    his head when he fell, and then a second report which

9    says he went to his knees and laid down.

10             Would either of those two, assuming -- Well,

11   let's take the first instance.  Let's say that, according

12   to the officer, he became rigid, meaning Mr. Cardenas; he

13   fell backwards; he fell on his rear end and then on his

14   back but did not strike his head.

15             Would those facts be consistent with the

16   death in this case?

17        A.    Are you -- are you indicating that there was

18   absolutely no witness of head strike to the ground?

19        Q.    Correct.  I'm relying on what the officer

20   said.

21             The officer reported he was standing 3 feet

22   away.  He discharged his taser.  Mr. Cardenas became

23   rigid and he fell backwards, and he landed on his rear

24   end and his back, but did not strike his head, according

25   to the officer who was only 3 feet away.

1          Would those facts be consistent with the
2    death in this case?
3          A.     No.
4          Q.     On then to the second version, which is that
5    Mr. Cardenas went to his knees and laid down.  We don't
6    know whether that was voluntary or not.  It's not
7    described.
8          But assuming he went to his knees and laid
9    down, would that be consistent with the death in this
10   case?
11         A.     No.
12         Q.     Describe to me, if you can, how hard the
13   occipital bone is.  Is that a pretty strong bone?
14         Well, I don't want to put words in your
15   mouth.  How strong a bone is that, if you can describe it
16   or quantify it?
17         A.     I can't other than to say it's a thick bone
18   which is one of the hardest substances in our body, if
19   not the hardest.
20         Q.     Would you agree that it would require a fair
21   amount of force to that bone in order to fracture it?
22         A.     I don't know what you mean by fair amount,
23   but more than it would -- you know, whatever threshold
24   that is, it obviously passed that threshold.
25         Q.     Okay.  But you can't say whether that head

1    or bleeding, a darker discoloration around the eyes.

2    That would lead me to think that maybe the base of the

3    skull might be fractured.

4              In this case this is a very common type of

5    finding with no real significance to us at autopsy.

6         Q.    Okay.  Going back to plaintiff's Exhibit

7    No. 2, the word you just used was ecchymosis.

8              Showing you Exhibit 2, there is

9    discoloration on what would be the right eye of

10   Mr. Cardenas; true?

11        A.    True.

12        Q.    Is that discoloration consistent with

13   ecchymosis?

14        A.    Sure, it looks like it from this photo.

15        Q.    Are there other potential causes of this

16   kind of discoloration that we see in Exhibit 2?

17        A.    Other potential other than?

18        Q.    Other than ecchymosis.

19        A.    I'm sorry.  I don't know what you're

20   referring to.

21        Q.    It was clearly a bad question.  I'm sorry.

22        A.    Are you talking about causation, like what

23   could cause this discoloration?

24        Q.    Well, no.  I'll do it again.

25              With regards to this particular

1    discoloration seen on Exhibit 2, are you relatively

2    certain that this is ecchymosis as opposed to some other

3    type of injury or trauma?

4         A.    Oh, no, I'm not.

5         Q.    So it could be something else?

6         A.    It could be a contusion, which is a bruise

7    which is a more externally inflicted trauma to the body.

8         Q.    And what are the available potential causes

9    of ecchymosis even if there is one?

10        A.    Bleeding within the brain within the

11   structures around it that tracks down into that region.

12   That is one potential cause.

13              Somebody in, you know, multisystem organ

14   failure could have a preponderance -- a tendency to

15   bleed, ecchymosis nature disease.  There's a long, long

16   list of potential causes for ecchymosis.

17        Q.    So blunt force trauma is indeed a potential

18   cause of ecchymosis?

19        A.    Correct.

20        Q.    And with regards to Exhibit 2, other than

21   Mr. Williamson's representation, do you have any

22   independent knowledge as to when this photograph was

23   taken?

24        A.    I do not.

25        Q.    And before today have you ever seen this

1    fractures, subdural hemorrhage -- those that all make

2    them more likely to be from a what we see by and large a

3    ground level fall than any other mechanism.  Can I say

4    absolutely?  No.  But based on what we know about

5    forensic science, that's the most likely conclusion.

6         Q.    Even though all of the history that was

7    provided to you -- in all of that history there is no

8    evidence of a strike to the ground -- of a head strike to

9    the ground?

10        A.    Other than the skull fracture and subdural

11   and the contrecoup contusion, you're right, there's no

12   history provided that the autopsy provides that

13   information.

14        Q.    But isn't it medically possible that if

15   Mr. Cardenas had struck something hard enough before the

16   fall to the ground before he was on the ground, that that

17   could have caused the trauma to his head that you

18   observed?

19        MR. WILLIAMSON:  Objection.  Calls for speculation.

20        THE WITNESS:  That is possible, yes.

21   BY MR. SAIN:

22        Q.    So in terms of cause of death, your

23   conclusion is that the cause of death was blunt force

24   trauma to the back of Mr. Cardenas's head; correct?

25        A.    No.

84

1          MR. WILLIAMSON:  I'm going to object.  It misstates

2     his testimony.

3          THE WITNESS:  No.  My conclusion is blunt head

4     trauma.

5     BY MR. SAIN:

6          Q.     Okay.  And that's what caused his death?

7          A.     Yes.

8          Q.     Okay.  And can you say to a reasonable

9     degree of medical certainty or probability that what

10    caused that blunt head trauma was a posterior fall to the

11    ground?

12         A.     No.

13         Q.     What role does documenting the ethnicity of

14    the person in your autopsy play in your reporting?

15         A.     I'm sorry.  I don't know what you mean by

16    role.

17         Q.     Well, I'll rephrase.

18             When you autopsy someone, is part of the

19    normal procedure to document what that person's ethnicity

20    is?

21         A.     Yes.

22         Q.     Why do we do that?

23         A.     To give you a depiction of the appearance of

24    that person.

25         Q.     And looking at, say, Exhibit 2, the

1   medical certainty or probability at what angle

2   Mr. Cardenas's head was struck?

3       A.    No.

4       Q.    Based on your examination of Mr. Cardenas's

5   body, can you determine with any degree of medical

6   certainty or probability exactly when Mr. Cardenas

7   received the blunt force trauma to the head?

8       A.    No.

9       Q.    Based solely on your examination of

10   Mr. Cardenas's body, can you determine with any degree of

11   medical certainty or probability -- Strike that.

12           In light of your examination of

13   Mr. Cardenas's body, are you able to exclude as potential

14   causes of blunt force trauma to Mr. Cardenas's head --

15   are you able to exclude causes other than a post-taser

16   fall to the ground with a head strike?

17       A.    No.

18       Q.    So causes other than a post-taser fall to

19   the ground with a head strike might have been the

20   mechanism that resulted in the blunt force trauma to

21   Mr. Cardenas's head?

22       MR. WILLIAMSON:  I'm going to object as vague

23   ambiguous.

24       THE WITNESS:  Can I hear that back?

25       MR. SAIN:  Sure.

1    Q.    So in terms of what caused the blunt force

2    trauma to Mr. Cardenas's head, are you able to exclude

3    causes other than a post-taser fall to the ground with a

4    head strike?  In other words, could it have been

5    something besides a post-taser fall to the ground?

6    A.    Yes, it could have been something else.

7    Q.    Based on your review of medical records,

8    your examination of Mr. Cardenas, is it medically

9    possible that Mr. Cardenas received any strikes or blows

10   of injuries to the head between his release from the

11   hospital on April 15, 2014 but before his readmission to

12   the hospital on April 22nd, 2014?

13   A.    I couldn't rule it out.

14   Q.    So that's possible?

15   A.    It's a possibility.

16   Q.    So assuming that Mr. Cardenas was having

17   severe headaches before the taser incident, assuming that

18   on the date of the incident he reports that he hit his

19   head inside of his car, and assuming that the only

20   officer who was there at the scene at the time of the

21   tasering said that Mr. Cardenas never hit his head at the

22   scene, in light of those three facts, can you conclude

23   with any degree of medical certainty or probability that

24   the cause of Mr. Cardenas's blunt force trauma to the

25   head was a post-taser fall to the ground?

REPORTER'S CERTIFICATE


        I, NATALIE BALLESTERO, CSR No. 10149, Certified

Shorthand Reporter, certify:

        That the foregoing proceedings were taken before

me at the time and place therein set forth, at which

time the witness was put under oath by me;

        That the testimony of the witness, the questions

propounded, an all objections and statements made at

the time of the examination were recorded

stenographically by me and were thereafter transcribed;

        That the foregoing is a true and correct

transcript of my shorthand notes so taken;

        I further certify that I am not a relative or

employee of any attorney of the parties, nor

financially interested in the action.

        Reading and signing was requested.

        I declare under penalty of perjury under the laws

of California that the foregoing is true and correct.

        Dated this 18th day of May, 2016.



_____
Natalie Ballestero, CSR No. 10149